### MIAL v. PARKHILL.

No. 9671.

Court of Civil Appeals of Texas. Galveston.
Feb. 19, 1932.

Rehearing Denied March 24, 1932.

See, also, 16 S.W.(2d) 1109.

Bowers & Bowers, of Caldwell, for appellant.

Alexander & Alexander, of Caldwell, for appellee.

PLEASANTS, C. J.

This suit was brought by appellee against appellant for the price of cotton poison claimed to have been sold to the appellant by the appellee. The account was duly verified.

The defendant by his sworn answer presented in the court below denied that he bought the poison from the plaintiff or in any way assumed or became liable for its purchase price. The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff. After all the evidence offered in the case had been adduced the defendant requested the court to instruct the jury to return a verdict in his favor. This request was refused, and the following special issues were submitted to the jury and answered as hereinafter shown:

"Special Issue No. 2: Did the said W. S. Mial, by his acts and conduct, lead the said T. B. Parkhill to believe that he (W. S. Mial) had authorized the said Ed Crabb to purchase thirty cans of poison for the account of the said W. S. Mial? Answer "Yes" or "No" as you may find. Answer: Yes.

"Special Issue No. 3: Was the said W. S. Mial beneficially interested in the said Ed Crabb's receiving the thirty cans of poison involved in this suit? Answer "Yes" or "No" as you may find. Answer: Yes.

"Special Issue No. 4: If you have answered any one of the foregoing special issues in the affirmative then answer the following: What was the market value of the poison so delivered at the time of its delivery? Answer in dollars and cents. Answer: $330.00."

█ The following evidence is disclosed by the record: The plaintiff, T. B. Parkhill, testified:

"I am in the grocery and feed business. A day or two before August 14th, 1926, Ed Crabb telephoned me and told me that the Captain had told him to get some poison to kill the worms on his cotton crop; he said he had tried several places and was unable to get it. He then asked me if I could let him have 30 cans of poison, and I told him that I could. He said to me over the phone 'the Captain told me to get some poison, and get it wherever I could,' I understood that the Captain referred to W. S. Mial, because Crabb always called W. S. Mial 'Captain.' I had some poison in Simpson's basement in Caldwell. Crabb came to Caldwell on Saturday and I delivered 10 cans of the poison to him then. On the following Sunday I was at the Gee Springs Camp ground; H. H. Womble telephoned me that Mr. Mial was in town and wanted to get some poison. I did not see Mr. Mial, but, Crabb was there on each occasion and helped load the poison. I came to town and let them have 10 more cans of the 30 cans I had reserved for Crabb; on the following Monday I delivered the remaining 10 cans to Crabb. I thought that I was selling this poison to W. S. Mial. I thought he was furnishing Ed Crabb to make a crop that year. The reason I thought this was that Mr. Mial had bought a car of maize from me that year for Crabb. He bought the maize from me, and I delivered it to Ed Crabb, Mr. Mial paid me for the maize.

"About a month after the delivery of the poison I saw Mr. Mial in the Bank and told him that money was scarce; and that I would like for him to pay me for the poison I delivered to Crabb; he told me that money was scarce with him too, and he could not pay me until after he had a settlement with his negroes; he repeated this same statement several days later at his gin in Brazos bottom; the first time that Mr. Mial denied that he owed me for all of this poison was over a month after I saw him at his gin. He came into my store and I again asked him to pay me for the poison. He told me he would pay for 5 cans of it that he had used himself; but, would not pay for any more. I refused to accept pay for 5 cans."

Plaintiff, T. B. Parkhill, on cross-examination, testified: "The poison was charged on my books to Ed Crabb; and I never saw or talked to W. S. Mial in this transaction until after the poison was delivered to Crabb. I supposed that Mr. Mial had authorized Ed Crabb to get the poison from me and that he would pay me for it. I did not know at the time the poison was delivered whether Ed Crabb was Mr. Mial's tenant or not. All I know was that Mr. Mial had paid me for a car of maize for Ed Crabb. Mr. Mial ordered this maize from me in person, and paid me cash for it."

T. B. Parkhill, on redirect examination, testified: "The reason I charged the poison to Ed Crabb on my books was that Mr. Mial had asked me to charge all of his tenants accounts to each of them directly in order to keep them straight, and then he would pay the accounts. I have never held Crabb liable on this account and I have never asked him to pay it to me."

The defendant testified that he did not authorize Crabb to buy any poison from plaintiff on his credit, did not promise to pay for any poison that Crabb bought from plaintiff, nor tell the plaintiff that he would pay for poison charged to Crabb, except for five cans that he got from Crabb, and that he offered to pay for these five cans because he had used them on his own farm. He further testified that Ed Crabb was not his tenant during the year 1926, and further: "I was not running Ed Crabb in the year 1926; I did buy him a car of maize; and about $225.00 worth of groceries. Ed Crabb had no other means of paying me for this car of maize and these groceries than the crop he was making that year. It was my custom to have Parkhill

charge my tenant's accounts to each of them directly in order to keep the accounts straight, and I would pay these accounts. Ed Crabb came to my house the day before he phoned Parkhill and I told him the worms were eating up my crop and that I was going to poison it. I told him that he had better get some poison and poison his crop too or he would not make anything, but, I did not tell him to get the poison on my credit."

Ed Crabb, a witness for defendant, testified: "In 1926 I was farming in Brazos Bottom. I was not a tenant of W. S. Mial, and I was not on his land. I was working land down the bottom from Mr. Mial, and I was working the James place which is a short distance from Mr. Mial's house. Mr. Mial was not running me that year. He did not authorize me to buy any poison on his credit. I telephoned from Dr. Krueger's place, and asked T. B. Parkhill to reserve 30 cans of poison for me. Parkhill told me he would reserve 30 cans of poison for me. I got 10 cans of it, and on the following Sunday Mr. Mial brought me to Caldwell and Mr. Mial got H. H. Womble to telephone to Parkhill to come in and let me have my poison. I think I got 26 cans that day. Mr. Mial was not there when the poison was loaded. I came to town with him in his car. He went back in the car before Parkhill came to town, and I waited and went back on the wagon with the poison. It was my wagon. W. S. Mial furnished me about $225.00 worth of groceries and a car load of maize during the year 1926. I was trading with no one else and no one else furnished me anything that year. The only way Mr. Mial had of getting his money for this car of maize and these groceries was out of the crop I was making that year. I had no other way of paying him except out of that crop."

We agree with the appellant that this state of the evidence required the court to instruct the jury to return a verdict in his favor.

Appellee's cause of action, as alleged in his petition, is:

"That heretofore towit, on the dates shown in the paragraph below, plaintiff, at the special instance and request of defendant as buyer in the regular course of business, sold and delivered to the defendant, the goods, wares and merchandise shown in such paragraph below. The defendant thereby became bound to pay the plaintiff on demand so much money as said goods, wares and merchandise were reasonably worth.

"That such goods, wares and merchandise on such dates so delivered were as follows and were reasonably worth the several sums of money set out in connection with them, respectively below:" (Here follows itemized statement of the account).

There is no evidence that appellant authorized Crabb to buy this poison for him or his account. On the contrary, the undisputed evidence of both Crabb and appellant shows that Crabb did not have such authority, and that he bought the poison for himself and had it charged to his own account.

Appellee testified that he never saw or talked to Mr. Mial in this transaction until after the poison was sold and delivered, and the price thereof charged to Crabb, and that he "supposed that Mr. Mial had authorized Ed Crabb to get the poison from him"; that he "did not know whether Ed Crabb was Mr. Mial's tenant or not, and that all he knew as to this was that Mr. Mial had paid him for a carload of maize for Ed Crabb"; that "Mr. Mial ordered this maize in person and paid him cash for it." Further testimony that: "The reason I charged the poison to Ed Crabb on my books was that Mr. Mial had asked me to charge all of his tenants accounts to each of them directly in order to keep them straight, and then he would pay the accounts. I have never held Crabb liable on this account and I have never asked him to pay it to me"—is no evidence in support of his claim that the contract for the purchase of the poison was the contract of appellant. We think it clear upon all the evidence that reasonable minds cannot differ in the conclusion that the contract upon which the suit is based was not appellant's contract, and that he cannot be held liable thereon. If he promised appellee, after the poison had been sold to Crabb, that he would pay for it, he assumed no liability by such promise, and it was unenforceable because it was not made in writing and was without consideration.

Upon the pleadings and the undisputed evidence the findings of the jury are wholly insufficient to sustain the judgment in favor of appellee. The fact that the acts and conduct of appellant may have led appellee to believe that appellant had authorized Crabb to purchase the poison for appellant could not make appellant liable for the purchase price of the poison, unless such acts and conduct of the appellant were fraudulent, or that appellant could reasonably anticipate therefrom that appellee would conclude that the poison was in fact sold to appellant. There is nothing in the evidence to show fraud or to justify the conclusion of appellee that the contract for the purchase of the poison was appellant's contract. The suit is not brought upon this theory, and there is no pleading to sustain a judgment based upon the findings of the jury.

These conclusions require that the judgment be reversed, and judgment here rendered for appellant, and it has been so ordered.

Reversed and rendered.